**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HELVETIA SWISS INSURANCE COMPANY, as a subrogee of HAEUSLER AG, DUGGINGEN, : | |
| : | |
| **Plaintiff** : | CIVIL ACTION NO. 3:16-1447 |
| **v** : | **(JUDGE MANNION)** |
| KEVIN T. JONES and MIDWEST TRANSPORTATION, LLC, : | |
| **Defendants/ Third Party Plaintiff**s : | |
| : | |
| **v** : | |
| JAMES D. FRANZMAN and TRANS AMERICAN TRUCKING SERVICE, INC., : | |
| **Third Party Defendants** : | |

## MEMORANDUM

Presently before the court is a motion for summary judgment filed on September 29, 2017 by third party defendants, Trans American Trucking Service, Inc. ("TAT"), and James D. Franzman ("Trans American" defendants or "Franzman/TAT"). (Doc. 34). This motion concerns a dispute over an insurance claim resulting from a motor vehicle accident which caused the total loss of commercial cargo owned by Haeusler AG, Duggingen ("Haeusler"), the subrogor of the plaintiff, Helvetia Swiss Insurance Company ("Helvetia"). The commercial cargo was being transported by a tractor trailer driven by Franzman on behalf of TAT. Before the instant action was commenced,

1

Helvetia and TAT settled any claims Helvetia had against TAT and, Helvetia received a payment for any damaged or lost freight which was set forth in the incorporated tariff. Helvetia then filed the present action against original defendants Kelvin T. Jones and America Midwest Transportation, LLC ("original defendants" or "Jones/Midwest"). Helvetia claims that Jones/Midwest are responsible for the accident which destroyed Haeusler's commercial cargo. Jones/Midwest then filed a third party complaint against Franzman/TAT, pursuant to Fed.R.Civ.P. 14, alleging claims of negligence. Jones/Midwest also assert claims for indemnification, contribution, and apportionment against Franzman/TAT. Franzman/TAT now move for summary judgment and argue that the state law claims brought against them by Jones/Midwest are barred since they are preempted by the Carmack Amendment of the Interstate Commerce Act, 49 U.S.C. §14706 ("Carmack Amendment").

For the reasons discussed below, Franzman/TAT's motion for summary judgment will be **DENIED IN ITS ENTIRETY**.

## I.    BACKGROUND

On October 28, 2015, a motor vehicle accident occurred resulting in the total loss of commercial cargo owned by Haeusler. The commercial cargo was being transported by a tractor trailer driven by Franzman on behalf of TAT. The cargo was subject to a Bill of Lading and an incorporated tariff. Helvetia settled its claims with TAT.

On July 13, 2016, Helvetia filed a complaint against Jones/Midwest alleging that they caused the accident which destroyed Haeusler's commercial cargo. (Doc. 1). Helvetia asserted claims of negligence and vicarious liability against Jones/Midwest.

On October 28, 2016, Jones/Midwest filed a third party complaint ("TPC") against Franzman/TAT, pursuant to Fed.R.Civ.P. 14, raising claims for negligence against Franzman and TAT (Counts I & II). Also, in Count I, Jones/Midwest raise claims for indemnification, and/or contribution, and/or apportionment against Franzman and TAT, and in Count II, they raise claims for indemnification, and/or contribution, and/or apportionment against TAT.[1] (Doc. 12). Jones/Midwest did not raise any statutory claims or claims under any federal law against Franzman/TAT.

Following discovery, Franzman/TAT filed a motion for summary judgment with respect to Jones/Midwest's TPC on September 29, 2017. (Doc. 34). Franzman/TAT's motion has been fully briefed, exhibits have been submitted, a statement of material facts was filed and Jones/Midwest

---

[1] A claim for contribution under Pennsylvania law "is not a recovery for the tort, but rather it is the enforcement of an equitable duty to share liability for the wrong done by both." Swartz v. Sunderland, 403 Pa. 222, 169 A.2d 289, 290 (1961).

Under Pennsylvania law, common law indemnity is an "equitable remedy that shifts the entire responsibility for damages from a party who, without any fault, has been required to pay because of a legal relationship to the party at fault." City of Wilkes-Barre v. Kaminski Bros., 804 A.2d 89, 92 (Pa.Commw.Ct. 2002).

responded to it.[2] Franzman/TAT also filed a request for oral argument, (Doc. 44), which is denied by the court since it finds the submissions of the parties sufficiently explain the relevant issues. In fact, the court allowed the parties to file supplemental briefs in this case and their positions on the issues have been clearly stated.

## II.  MATERIAL FACTS

On October 28, 2015, Jones was driving a tractor trailer owned by America Midwest Transportation, LLC. Jones was traveling west on U.S. Interstate Route 80 ("I-80") in Carbon County, PA. Franzman was also traveling west on 1-80 behind Jones, and he was driving a tractor trailer owned by TAT. Franzman was employed by TAT[3] and he was transporting a piece of commercial machinery, namely, a Bending Machine, which was owned by Haeusler. The destination for the Bending Machine was Chicago, IL.

Jones lost control of his tractor trailer and the trailer overturned and came to a stop blocking both lanes of traffic on I-80 west. Thereafter,

---

2  Contrary to Local Rule 56.1, M.D.Pa., Jones/Midwest denied some of the statements contained in Franzman/TAT's material facts without citation to the record for support. (Doc. 37 at 11-12). These unsupported denials are not considered.

3  Specifically, the TPC avers that "Franzman was an employee of and/or agent of and/or contractor to Trans American and was operating the subject tractor trailer on its behalf and within the scope of his employment, agency or contract."

Franzman came around a curve on I-80 and he approached the blocked lanes of traffic caused by Jones' trailer. Franzman braked suddenly to avoid hitting the stopped traffic and the overturned tractor trailer on the highway which resulted in the Bending Machine he was transporting to fall from his flatbed trailer. The Bending Machine sustained significant damage from the fall.

Jones/Midwest allege in their TPC that Franzman was speeding and driving too fast for conditions in heavy rain and that he failed to keep a proper lookout to see that vehicles were stopped ahead of him in both lanes on I-80 west. Jones/Midwest also allege that Franzman lost control of his truck due to his own negligence which caused the Bending Machine to fall off his truck resulting in the damages for which Helvetia seeks recovery in its complaint against them. The Bending Machine was later determined to be a total loss due to the damage it sustained in the accident.

The parties dispute, however, whether the Bending Machine was being shipped by TAT pursuant to a Bill of Lading, as Franzman/TAT claim, (Doc. 35-1), or whether it was shipped pursuant to a Negotiable Multimodal Transport Bill of Lading ("NMTBL"), as Jones/Midwest claim. Franzman/TAT argue that because the Bending Machine was shipped pursuant to a Bill of Lading, any freight claims made, are covered by the Bill of Lading, which incorporated a tariff setting forth the calculation of payment for a claim for damaged or lost freight. However, the evidence submitted by Jones/Midwest shows that the Bending Machine shipment originated overseas in Switzerland and that it was shipped to the United States pursuant to a single through

NMTBL, not a Bill of Lading. (Doc. 37, Ex. A).

After the accident, TAT, through its insurer, The Hartford, settled with Helvetia, (which was Haeusler's insurance provider), for $133,930.80 and a Release was executed for any claim or demand arising from the accident. (Doc. 35-3). TAT contends that the amount contained in the settlement Release between it and Helvetia was "based upon the agreed-to loss rate for freight claims which is referenced on the Bill of Lading and the related Tariff." However, Jones/Midwest contend that the Release makes no reference to the calculation of damages or any tariff, nor does the Release include Franzman. However, the Release did include TAT as well as its agents, servants and employees from any claim by Helvetia. (Doc. 35-3).

This court has diversity jurisdiction over this case pursuant to 28 U.S.C. §1332.


## III.    STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive

law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Casualty & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249 ; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (holding that a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element

essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

## IV. DISCUSSION

Jones/Midwest's TPC is filed against Franzman/TAT pursuant to Federal Rule of Civil Procedure 14, which, provides, "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." Fed.R.Civ.P. 14(a)(1). To assert a claim under Rule 14(a)(1), the third-party liability must be entirely dependant on the impleader's liability to the original plaintiff. As a court in this district succinctly stated:

> The crucial characteristic of a Rule 14 claim is that defendant is attempting to transfer to the third-party defendant the liability asserted against him by the original plaintiff. Third-party liability must depend on the outcome of the main claim and derive from defendant's liability to the plaintiff in the main action so that, if the third-party plaintiff is found liable, the third-party defendant will be liable to the third-party plaintiff under a theory of indemnification, contribution, or some other theory of derivative liability recognized by the relevant substantive law. Rocuba v. Mackrell, 10-CV-1465, 2011 WL 5869787, *1 (M.D.Pa. 2011).

"Where ... state substantive law recognizes a right of contribution and/or indemnity, impleader under Rule 14 is the proper procedure by which to assert such claims." EQT Production Company v. Terra Services, LLC, 179 F.Supp.3d 486, 492-93 (W.D.Pa. 2016) (citations omitted). "As Rule 14 only

8

provides the procedural mechanism for filing a third-party complaint, a party's substantive rights to contribution and common law indemnity are determined by state law." Id. at 493 (citation omitted). "In general, whether a particular third-party defendant may be impleaded is a question which 'rests with the sound discretion of the trial court.'" Id. (citations omitted).

First, at issue is whether the Carmack Amendment preempts the state law negligence claims brought against Franzman/TAT by Jones/Midwest. TAT argues that the state law claims are barred since the Carmack Amendment is the exclusive cause of action for interstate shipping contract and tort claims alleging loss or damage to property. Jones/Midwest contend that the Carmack Amendment is only applicable to claims between interstate carriers and cargo owners that have a contract to ship goods. However, Jones/Midwest state that they did not have any contract with Trans American and therefore the Amendment does not apply to its claims. They also state that since the shipment of the Bending Machine originated overseas pursuant to a NMTBL, the Carmack Amendment is not applicable.

There is no dispute that Jones/Midwest's claims against Franzman/TAT are based on state common law negligence theories and they seek money damages relating to the damage to the cargo involved in the accident. There is also no dispute that Jones/Midwest and Franzman/TAT were not parties to any contract with each other.

Franzman/TAT also argue that they are entitled to summary judgment with respect to Jones/Midwest's claims for indemnification since there is no legal relation between them. In their TPC, Jones/Midwest assert that if it is

determined that Helvetia can recover damages against either or both of them, then they seek indemnification from Franzman/TAT. Jones/Midwest also allege in their TPC that Franzman/TAT owed a duty to exercise reasonable care in operating TAT's tractor trailer to them and others using the roadway.

Further, Franzman/TAT state that Jones/Midwest's claims for indemnification fail since Jones/Midwest must be found actively negligent and liable to Helvetia to make out their claim for indemnification. Thus, they contend that since Jones/Midwest base their indemnification claims upon a finding of their own contributing negligence, these claims fail.

Franzman/TAT additionally state that Jones/Midwest's claims for contribution are limited under the Carmack Amendment and that "the maximum amount of damages that could be attributable to [them] has already been paid via an application of the Bill of Lading and Tariff pursuant to the [Amendment]." TAT states that it limited its liability to Haeusler based on the tariff as allowed by the Carmack Amendment and, that "the total amount that it could therefore be found liable for, in relation to the damaged commercial cargo, has already been paid to plaintiff." Thus, Franzman/TAT contend that if the court allows Jones/Midwest to proceed on the claims for contribution and indemnification against them, the court should limit their total liability to the amount paid to Helvetia.

Jones/Midwest respond by stating that the Release makes no reference to the calculation of damages or any tariff, and that the Release does not include Franzman. They point out that Franzman is not a party to any contract or bill of lading regarding the shipment of the Bending Machine. Thus,

Jones/Midwest state that even if the Carmack Amendment is applicable, Franzman's liability is totally outside of the Amendment's purview since the only claims available against him are the common law tort claims.

Jones/Midwest also reassert their contention that the Carmack Amendment is not applicable to their claims against either Franzman or TAT since they did not have a contract with Franzman or TAT and since the only claims available to them are common law negligence claims. They further reiterate that since the shipment of the Bending Machine originated overseas under a single through bill of lading, the Carmack Amendment does not apply.

The three issues presented are: whether original defendants' negligence claims against Trans American defendants are barred by the Carmack Amendment; whether original defendants' claims for indemnification against Trans American defendants should be dismissed; and whether original defendants' claims for contribution against Trans American defendants should be limited by the Carmack Amendment or by the NMTBL and the incorporated UNCTAD/ICC Rules.

### Carmack Amendment

"[T]he Carmack Amendment became applicable to motor carriers by the Motor Carrier Act of 1935." Certain Underwriters at Interest at Lloyds of London v. United Parcel Service of America, Inc., 762 F.3d 332, 335 (3d Cir. 2014). The Third Circuit stated:

> The general rule is that an interstate carrier is strictly liable for damages up to "the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) [certain intermediary carriers]." 49 U.S.C. §14706(a)(1). A shipper and

carrier can agree to limit the carrier's liability "to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances" in order for the shipper to obtain a reduced rate. Id. §14706(c)(1)(A). Shippers may bring a federal private cause of action directly under the Carmack Amendment against a carrier for damages. Id. §14706(d).

Thus, while the Carmack Amendment aided shippers by making "carriers strictly liable for damage to or loss of goods," "carriers obtained a uniform, nationwide scheme of liability, with damages limited to actual loss—or less if the shipper and carrier could agree to a lower declared value of the shipment." Id.

Additionally, the Carmack Amendment preempts state laws. "[T]he Supreme Court has consistently held that the Carmack Amendment has completely occupied the field of interstate shipping." Id. In fact, "[a]lmost every detail of [interstate shipping] is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it." Id. (citation omitted). "The [Supreme] Court has consistently described the Amendment's preemptive force as exceedingly broad—broad enough to embrace 'all losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation.'" Id. (citation omitted). As such, "[s]tate laws are preempted regardless of whether they contradict or supplement Carmack relief." Id. (citation omitted).

"The Courts of Appeals have also unanimously held that the Carmack

Amendment 'preempts all state or common law remedies available to a shipper against a carrier for loss or damage to interstate shipments.'" Id. at 336 (citation omitted). Court of Appeals "have dismissed state and common law claims for breach of contract, negligence, conversion and every other action for loss of or injury to a shipment of goods", and several circuits "have consistently held that the Carmack Amendment is the 'exclusive cause of action for interstate-shipping contract [and tort] claims alleging loss or damage to property.'" Id. (citation omitted). Although there is "a peripheral set of state and common law causes of action that are not preempted by the Carmack Amendment", such as claims that do not "enlarge or limit the responsibilities of the carrier for loss of property", claims that seek to recover for the loss of the shipper's goods are "at the heart of the Carmack preemption." Id. at 336 n. 4. Thus, the Third Circuit has held "that state law breach of contract and negligence claims against a carrier for loss of or damage to goods are preempted." Id. (citation omitted).

Despite the apparent broad read of the Carmack Amendment, it is not applicable to Jones/Midwest's claims for indemnification and contribution against Franzman/TAT since it "preempts all state law causes of action **[by shippers**] alleging liability for lost or damaged property against interstate carriers." Alpine Fresh, Inc. v. Jala Trucking Corp., 181 F.Supp.3d 250, 255-56 (D.N.J. 2016) (citation omitted) (emphasis added). As such, even though the Carmack Amendment seemingly would have applied to any claims that the plaintiff, as **the shipper**, raised directly against TAT, its carrier, it is not

applicable to the Jones/Midwest's claims for indemnification and contribution against Franzman/TAT since Jones/Midwest are not a **shipper** seeking to recover for a loss against its interstate carrier. *See* Alpine Fresh, 181 F.Supp.3d at 255 ("If the company acted as a carrier, the claims [by the shipper] were "barred by the implied preemptive effect of the Carmack Amendment ....") (citation omitted). Simply stated, the claims raised by Jones/Midwest against Franzman/TAT in their TPC do not involve any claim between a shipper and its interstate carrier.

Next, the court considers whether the Carmack Amendment applies to the Jones/Midwest's common law claims for negligence against Franzman/TAT in the TPC. Jones/Midwest state that "[t]he Carmack Amendment does not apply to a shipment originating overseas under a single through bill of lading." They cite to Kawasaki Kisen Kaisha, Ltd. v. Regal-Beliot, Corp., 561 U.S. 89, 130 S.Ct. 2433 (2010), as well as Royal & Sun Alliance Insurance, PLC v. Ocean World Lines. Inc., 612 F. 3d 138 (2d Cir. 2010), to support their contention.

In our case there was an intermodal shipment of the Bending Machine overseas via a single through bill of lading. Based on the *Kawasaki* and *Royal & Sun* cases, the Carmack Amendment does not apply to the shipment of this Bending Machine which undisputedly originated overseas under a single through bill of lading. *See also* CNA Ins. Co. v. Hyundai Merchant Marine Co., Ltd., 747 F.3d 339, 366 (6th Cir. 2014) (Sixth Circuit stated that "the rule of *Kawasaki* appears to be that Carmack does not apply to the overseas

shipment of goods—import or export—shipped under a single through bill of lading."). Specifically, in *CNA*, id. at 370, the Sixth Circuit held that, based on "the post-*Kawasaki* federal and state court decisions," "the Carmack Amendment does not apply to the road or rail leg of an intermodal overseas export shipped under a single through bill of lading."

Since there was a single through bill of lading, i.e., the NMTBL, and it covered the entire course of the journey of the Bending Machine to Chicago, the Carmack Amendment does not apply. (Doc. 37, Ex. A).

With respect to damages, Franzman/TAT argue that Jones/Midwest's claims for contribution against them should be limited by the Carmack Amendment since the maximum amount of damages for which they could be held liable has already been paid by an application of the Bill of Lading and Tariff. "Under the Carmack Amendment, the liability imposed is for the "actual loss or injury to the property." Penske Logistics, Inc. v. KLLM, Inc., 285 F.Supp.2d 468, 473 (D.N.J. 2003) (citing 49 U.S.C. §14706(a)). As such, Franzman/TAT claim that their liability must be limited by operation of the Carmack Amendment to the amount TAT paid pursuant to its Bill of Lading.

However, since the Carmack Amendment is not applicable to Jones/Midwest's claims against Franzman/TAT, TAT cannot rely upon the Carmack Amendment to limit its liability to Jones/Midwest.

In the alternative, Franzman/TAT argue that even if the Carmack Amendment does not apply, the terms agreed to by the parties in TAT's Bill of Lading, (Doc. 35, Ex. A), which is a contract, govern their obligations and

liabilities. They state that in this case, the terms include an agreed-to provision setting forth the maximum damages that TAT would pay in the event of a freight claim, and that payment was made by TAT to Helvetia and a corresponding Release was executed.

Franzman/TAT's evidence indicates that the Bending Machine arrived from Antwerp, via overseas shipment, to New Jersey. TAT was retained by the broker, Jagro Customs Brokers, Inc., to transport the machine to Chicago and a Bill of Lading was issued by TAT. (Doc. 35, Ex. A).

TAT, (Doc. 39 at 6), then explains as follows:

> In the event of any freight claims, the document - which the Trans American Defendants maintain is a separate bill of lading - issued by Trans American Trucking Service incorporated a tariff which set forth the calculation of payment for any claim for damaged or lost freight. [Doc. 35, Exs. A & B]. This freight loss rate provided that claims would be paid at a rate of $1.35 per pound. As the total weight of the cargo that was lost due to the accident was 99,208 pounds, a claim for a total loss based upon the agreed-to rate would equal $133,930.80. Pursuant to this agreed-to freight-loss rate, [TAT], with its insurance provider, paid $133,930.80 in exchange for a full and final release of any claim or demand arising from the incident. [Doc. 35, Ex. C].

Thus, Franzman/TAT state that even if "the Carmack Amendment does not apply, *Kawasaki* clearly requires that the terms agreed-to by parties in shipping contracts control", and that "the facts clearly demonstrate that the [their] total liability has been limited by the agreed-to terms."

The October 10, 2015 Multimodal Transport Bill of Lading indicated that it was "[i]ssued subject to UNCTAD/ICC Rules for Multimodal Transport

Documents (ICC Publication 481)."[4] Franzman/TAT state that if this Bill of Lading applies, "then the ICC rules incorporated into the Oct.10 Bill of Lading apply", and that these rules "provide that any multimodal transport operation ("MTO") and any of its servants, agents, or other person whose services the MTO has used in order to perform any portion of the multimodal transport contract can limit its liability." (Doc. 39 at 7) (citing UNCTAD/ICC Rules 2.2, 12, 6). They state that based on UNCTAD/ICC Rule 6, their "liability was separately successfully limited by the agreed-to freight calculation." Trans American defendants argue that even if the NMTBL was the sole title document involved in the shipment, as the court has found it was, they are still entitled to a limitation of their liability pursuant to its contractual terms.

In Sompo, 891 F.Supp.2d at 496, the court discussed a mulitmodal bill of lading when the goods are largely shipped by sea, like the one in the present case, and stated:

> A multi-modal bill of lading requiring "substantial carriage of goods by sea" is a maritime contract. *See* Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 27, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004) ("[S]o long as a bill of lading requires substantial carriage of goods by sea, ... it is a maritime contract. Its character as a maritime contract is not defeated simply because it also provides for some land carriage."). Federal law controls the interpretation of maritime contracts when "the dispute is not inherently local." Id. at 22–23, 125 S.Ct. 385.

> Generally, "contracts for carriage of goods by sea must be

---

4 *See* http://unctad.org/en/docs/posdtetlbd2.en.pdf for the Rules for Multimodal Transport.

construed like any other contracts: by their terms and consistent with the intent of the parties." Id. at 31, 125 S.Ct. 385. Potential ambiguities should be interpreted to give "reasonable and effective meaning to all terms of a contract" and to avoid "leav[ing] a portion of the writing useless or inexplicable." Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 558 (2d Cir. 2000).

Franzman/TAT state that since "the UNCTAD Rules are contractual in nature and provide for the limitation of liability for the shipper and its agents, any clause limiting liability must be given effect under contract precepts." Franzman/TAT then state in their supplemental brief, (Doc. 42), that since the parties to the shipment incorporated contractual rules which provided for the limitation of liability of the carriers involved in the shipment of the Bending Machine, their "liability exposure is limited to the amount paid to Plaintiff via Release, which was based on an agreed-to lost freight calculation included within the shipment documents." They argue that this clause "must be enforced and summary judgment should be granted as to the amount of liability that could be attributed to the Trans American Defendants for claims related to the lost subject cargo."

Franzman/TAT, (Id. at 5-6), explain as follows:

The UNCTAD Rules state that if reference by way of incorporation is made, then the rules apply irrespective of whether there is a multimodal transport contract involving one or several modes of transport or whether a specific document has been issued or not. (UNCTAD Rules 1.1). The Rules define multimodal transport contract as any arrangement where a single contract governs the carriage of goods by at least two different modes of transport. (UNCTAD Rules 2.1). A multimodal transport operator ("MTO") is any person who concludes a multimodal transport contract and assumes responsibility for the performance thereof as a carrier. (UNCTAD Rules 2.2). Within the rules, a carrier is defined as any person who "actually performs or undertakes to perform

18

the carriage [of goods], whether he is identical with the multimodal transport operator or not." (UNCTAD Rules 2.3). Here, Trans American Trucking Service, Inc. was a carrier working on behalf of Jagro Customs Broker & International Freight Forwarders, which acted as the MTO within the meaning of the Multimodal Bill of Lading and the incorporated UNCTAD Rules. [Doc. 37, Ex. A].

The UNCTAD Rules further provide for the limitation of liability in Article 6. Article 6.1 provides that, if the value of the goods is not declared and listed on a multimodal transport document, the parties can limit the liability of the MTO provided that its liability does not exceed a calculation set forth in Rule 6.1 (UNCTAD Rule 6.1). Finally, Rule 11 provides that the UNCTAD Rules apply to all claims relating to the performance of the multimodal transport contract, whether the claim be founded in contract or tort. (UNCTAD Rule 11).  The applicability of the UNCTAD Rules as described here is extended from the MTO to any of its servants, agents, or other person or entity whose services the MTO has used in order to perform any portion of the transport contract. (UNCTAD Rule 12).

Franzman/TAT, (Doc. 42 at 9), explain that "[TAT] was retained by Jagro, the MTO within the meaning of the UNCTAD Rules incorporated into the Oct. 10 [NMTBL], and is therefore entitled to the same limitation of liability afforded Jagro under the rules." They argue that the Supreme Court in *Kawasaki,* 561 U.S. at 109–11, recognized the principle that the contractual terms agreed-to by the parties (in that case, the forum selection clause negotiated between the cargo owner and intermediary), govern their obligations and liabilities.

Jones/Midwest argue in their supplemental brief, (Doc. 43), that while Franzman/TAT reference the UNCTAD Rules and argue that they are contractual, there is simply no contract between them and Franzman/TAT in this case and their claims are only based on negligence. Jones/Midwest

contend that there were no agreed-to terms in any shipping contract between them and Franzman/TAT that would serve to limit their claims against Franzman/TAT in this case.

The court agrees with Jones/Midwest and finds that UNCTAD Rules do not apply to Jones/Midwest's negligence claims against Franzman/TAT. No doubt that the Multimodal Bill of Lading is a maritime contract, *see* Sompo, 891 F.Supp.2d at 496, and it clearly incorporated the UNCTAD Rules. Based on ordinary contract interpretation, the court looks to the written language of the NMTBL to determine the intent of the parties since the provision subjected it to the UNCTAD Rules is unambiguous. While the court agrees with Franzman/TAT that based on these Rules, TAT's liability was limited by the Bill of Lading TAT issued to Jagro Inc., (Doc. 35-1), when it picked up the Bending Machine at the port to transport it by truck to Chicago, this limit applied only to the parties of the NMTBL. There is no dispute that Jones/Midwest are not parties to the NMTBL. Nor is there any dispute that no contract existed between Jones/Midwest and Franzman/TAT. Thus, there is simply no privity of contract between Jones/Midwest and Franzman/TAT and the limit on TAT's liability contained in the NMTBL does not restrict the maximum amount of damages that TAT would have to pay Jones/Midwest if they prevail on their claims against Franzman/TAT.

As such, the court finds that Franzman/TAT's liability in this case has not been limited by the UNCTAD Rules. Thus, Franzman/TAT are not entitled to summary judgment as to Jones/Midwest's claims against them for an

amount in excess of the agreed-to freight loss rate contained in TAT's Bill of Lading, (Doc. 35-1), which TAT paid pursuant to the Release it entered into with Helvetia.

Therefore, Franzman/TAT's motion for summary judgment to limit Jones/Midwest's claims for contribution to the agreed-to freight loss rate contained in TAT's Bill of Lading which they paid to Helvetia pursuant to the Release will be denied.

Finally, Franzman/TAT argue that Jones/Midwest cannot seek indemnification from them since Jones/Midwest are guilty of independent acts of negligence that are also the cause of the accident at issue. They contend that Jones/Midwest's claims for indemnification are based upon a finding of their own contributing negligence in the accident at issue and that Jones/Midwest seek indemnification from them if they are found liable to Helvetia. Jones/Midwest maintain that since Jones/Midwest do not identify any evidence that supports "any finding of common law indemnification that is not predicated upon an initial finding of their own negligence", they are entitled to summary judgment on these claims.

Since the court has diversity jurisdiction over this case, it applies Pennsylvania's substantive law. *See* Erie R. R. Co. v. Tompkins, 304 U.S. 64 (1938). In Rich v. Brandywine Insurance Advisors, LLC, 2017 WL 961002, *3 (E.D.Pa. March 10, 2017), the court discussed a claim for indemnification under Pennsylvania law and stated:

"Under Pennsylvania law, indemnity is available only from those

who are primarily liable to those who are merely secondarily or vicariously liable." In re One Meridian Plaza Fire Litigation, 820 F. Supp. 1492, 1496 (E.D. Pa. 1993). "Indemnity, if applicable, would shift the entire liability for plaintiff's loss from a third-party plaintiff to third-party defendant." Id. Indemnification is a right "which enures to a person who, *without active fault on his own part*, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable." TVSM Inc. v. Alexander & Alexander, Inc., 583 F. Supp. 1089, 1091 (E.D. Pa. 1984) (emphasis added) (citing Builders Supply Co. v. McCabe, 77 A.2d 368 (Pa. 1951)). "Indemnity is a narrow form of relief extended in limited circumstances. Liability will not be shifted simply because another party bears some fault." Merrill Lynch, et al. v. Staiman, 771 F. Supp. 102, 105 (E.D. Pa. Aug. 15, 1991).

Additionally, "[t]he relevant question, with respect to indemnity, is not who bears 'primary responsibility,' but rather 'whether the party seeking indemnity ... had any part in causing the injury.'" Id. (citation omitted). Common law indemnity "is a fault-shifting mechanism that comes into play when a defendant held liable by operation of law seeks to recover from a defendant whose conduct actually caused the loss", and "[it] is appropriate when a defendant's liability arises not out of its own conduct, but out of a relationship that legally compels the defendant to pay for the act or omission of a third party." EQT Production Company,  179 F.Supp.3d at 493 (internal citations omitted).

In its complaint against Jones/Midwest, Helvetia alleges that Jones/Midwest were negligent and caused the damage to its Bending Machine. As such, Franzman/TAT essentially argue that "indemnity is not available where, as here, the third-party plaintiff [i.e., Jones/Midwest] had some 'active fault' in the damage done to the injured party." Rich, 2017 WL

961002, *3 (citing McCabe, 77 A.2d at 370).

With respect to Jones/Midwest's claims for indemnification against Franzman/TAT, the court cannot determine if these claims are "founded upon at least a partial finding of [Jones/Midwest's] own negligence", as TAT contends, since the jury will have to decide if Jones/Midwest were negligent to any degree in this case. Jones/Midwest allege in their TPC that when the traffic was stopped on I-80, the negligence of Franzman caused him to lose control and caused the Bending Machine to fall off the back of his trailer. It is for the jury to decide if Franzman was in fact negligent and, if so, whether his negligence was the sole cause of the damage to the Machine. However, it is also for the jury to decide if Jones' alleged negligence was the cause of the traffic stoppage on I-80 in the first place as Helvetia avers in its complaint, and whether Jones' conduct then caused the damage to the Machine. Thus, the jury will have to decide if Jones' alleged negligence caused his disabled vehicle to block traffic on the highway and if his alleged conduct caused Franzman to quickly apply his brakes and lose control of his vehicle causing the Bending Machine to fall from the trailer. The jury will also have to decide if Franzman's alleged conduct in driving too fast and not leaving a safe distance with vehicles ahead of him was the actual cause of the Machine to fall off his trailer.

Therefore, the court will deny Franzman/TAT's motion for summary judgment with respect to Jones/Midwest's claims for indemnification in the TPC.

## V. CONCLUSION

For the reasons discussed herein, Franzman/TAT's motion for summary judgment, (Doc. 34), is **DENIED IN ITS ENTIRETY**. Specifically, the motion is **DENIED** with respect to Jones/Midwest's claims for indemnification in their TPC. The motion is also **DENIED** with respect to Jones/Midwest's claims for contribution against Franzman/TAT in their TPC. Further, Franzman/TAT's request for oral argument is **DENIED**. An appropriate order shall follow.


S/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**




**Date: September 19, 2018**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2016 MEMORANDA\16-1447-01.wpd